[L. A. No. 20801.   In Bank.   May 13, 1949.]

RAYMOND GEORGE et al., Respondents, v. BEKINS VAN AND STORAGE CO. (a Corporation), Appellant.

Chase, Rotchford, Downen & Chase, Robt. E. Moore, Jr., and Richard T. Drukker for Appellant.

Musick, Burrell & Ingebretsen and Clayton Straub, as Amici Curiae on behalf of Appellant.

C. Paul DuBois and Henry F. Walker for Respondents.

TRAYNOR, J.—Plaintiffs' household furnishings and effects were destroyed by fire while in the possession of defendant at its Grand Avenue Warehouse in Los Angeles. They brought this action to recover the value of the goods destroyed, alleging six separate causes of action. The trial court made findings of fact and conclusions of law in support of three of these causes that alleged, respectively, that defendant converted plaintiffs' goods, that defendant breached its contract to store and redeliver the goods, and that the goods were destroyed by fire as a result of defendant's negligence. Defendant appeals from the judgment entered thereon. It contends at the outset that the evidence does not support the findings.

The tort of conversion exists if there is an exertion of wrongful dominion over the personal property of another in denial of or inconsistent with his rights therein. (*Zaslow* v. *Kroenert*, 29 Cal.2d 541, 549 [176 P.2d 1] ; *Gruber* v. *Pacific States Sav. & Loan Co.*, 13 Cal.2d 144, 148 [88 P.2d 137] ; see Prosser on Torts, p. 95.) The tort is committed when a bailee having the power to do so refuses to redeliver goods to which the bailor is entitled. (*Edwards* v. *Jenkins*, 214 Cal. 713, 720 [7 P.2d 702] ; see Rest., Torts, § 223 ; Prosser on Torts, p. 105.) It is thus generally held that a prima facie case is made out by proof of the bailment and subsequent refusal of the bailee to make delivery on demand. (*Doot* v. *Skirving Warehouse Co.*, 202 Cal. 75, 78 [259 P. 81] ; *Chatterton* v. *Boone*, 81 Cal.App.2d 943, 945 [185 P.2d 610] ; *Vagim* v. *Haslett Warehouse Co.*, 131 Cal.App. 197, 201 [20 P.2d 992] ; *Wolfe* v. *Willard H. George, Inc.*, 110 Cal.App. 532, 535

[294 P. 436] ; *Atwood* v. *Southern California Ice Co.*, 63 Cal. App. 343, 346 [218 P. 283] ; *U Drive, etc. Ltd.* v. *System A. Parks*, 28 Cal.App.2d Supp. 782, 784 [71 P.2d 354].) ▮ If redelivery is impossible, however, because the goods have been lost or destroyed, either without fault on the part of the bailee or merely because of his negligence, there is no conversion. ▮ Negligence in caring for the goods is not an act of dominion over them such as is necessary to make the bailee liable as a converter. (*Rogers* v. *Huie*, 2 Cal. 571, 572 [56 Am.Dec. 363] ; *Emmert* v. *United Bank etc. Co.*, 14 Cal. App.2d 1, 4 [57 P.2d 963] ; *Cass* v. *Ocean Park Bath Co.*, 45 Cal.App. 656, 658 [188 P. 616] ; see *Zaslow* v.*Kroenert*, 29 Cal.2d 541, 550 [176 P.2d 1] ; Rest., Torts, § 224; Prosser on Torts, p. 106.) In the cases relied on by plaintiffs for the proposition that negligence in caring for the goods lost or destroyed constitutes conversion, either more than negligence was shown (*Wolfe* v. *Willard H. George, Inc.*, 110 Cal.App. 532 [294 P. 436] ; *First Nat. Bank* v. *Crown T. & S. Co.*, 89 Cal.App. 243 [264 P. 534] ; *Atwood* v. *Southern California Ice Co.*, 63 Cal.App. 343 [218 P. 283]), or the evidence would have supported the judgment on either a breach of contract or negligence theory, and no point was raised as to the sufficiency of the pleadings to support the judgment. (*Wilson* v. *Crown Transfer etc. Co.*, 201 Cal. 701 [258 P. 596] ; *Dieterle* v. *Bekin*, 143 Cal. 683 [77 P. 664] ; see, also, *Scott's V. F. Exch.* v. *Growers Refrig. Co.*, 81 Cal.App.2d 437, 440 [184 P.2d 183].) ▮ Since the trial court found that plaintiffs' goods were destroyed by fire as a result of defendant's negligence, the finding that defendant converted plaintiffs' goods cannot be sustained.

▮ The evidence shows that the fire started in the bailments on a well-lighted aisle near the toilet on the second floor of the warehouse and destroyed or seriously damaged all the goods on that floor including plaintiffs'. Although the fire was discovered within half an hour after it started, there were no witnesses who were in the building at the time who could explain its cause. Since the construction of the building and the speed with which the fire spread made it unlikely that it was caused by defective wiring, heating equipment, or spontaneous combustion, it seems probable that the fire was started by some person on the second floor, either deliberately or as a result of negligence. Defendant had a rigid rule, enforced by discharging violators, against smoking in the warehouse except in one designated area of the first floor. No unauthor-

ized persons were allowed above the first floor of the warehouse. After the fire some cigarette butts were found in the toilet on the second floor, but firemen had been smoking on that floor during the fire.

Defendant contends that this evidence does not support a finding that the fire was caused by negligence on the part of defendant or its employees. If, as plaintiffs contend, however, the burden of proof is upon defendant to establish that the fire was not caused by its negligence, it is not necessary to decide whether the evidence would support a judgment for plaintiffs if they had the burden of proof. Defendant cannot explain the fire, and the fact that it enforced rigid rules to prevent fire does not preclude as a matter of law a finding that it was at least as probable that the fire was caused by negligence on the part of defendant or its employees as by a cause for which defendant would not be legally responsible.

██ Section 21 of the Uniform Warehouse Receipts Act provides: "A warehouseman shall be liable for any loss or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful owner of similar goods would exercise, but he shall not be liable, in the absence of an agreement to the contrary, for any loss or injury to the goods which could not have been avoided by the exercise of such care." ([Stats. 1909, p. 437 as amended] 3 Deering's Gen. Laws, Act 9059, § 21.) Section 8 of the same act provides in part: "In case the warehouseman refuses or fails to deliver the goods in compliance with a [proper] demand . . ., the burden shall be upon the warehouseman to establish the existence of a lawful excuse for such refusal." (3 Deering's Gen. Laws, Act 9059, § 8.) Defendant contends that its duty to establish a lawful excuse is discharged by a showing that the goods were destroyed by fire, and that plaintiffs then have the burden of proving that the loss was caused by defendant's failure to exercise the care required by section 21. There is a conflict among the jurisdictions that have adopted the uniform act whether section 8 places the burden of proving due care on defendant when the goods have been lost or destroyed. (See Uniform Laws Annotated, pp. 37-43; Cumulative Annual Pocket Part [1948], pp. 45-49.) In California, both before and after the adoption of the uniform act, the decisions considering the question of burden of proof have been conflicting and confusing. (Burden of proof on plaintiff: *Runkle* v. *Southern Pacific Milling Co.*, 184 Cal. 714, 721 [195 P. 398,

16 A.L.R. 275] ; *Taussig* v. *Bode & Haslett,* 134 Cal. 260, 263 [66 P. 259, 86 Am.St.Rep. 250, 54 L.R.A. 774] ; *Wilson* v. *Southern Pacific R. R. Co.,* 62 Cal. 164, 172; *Jackson* v. *Sacramento Valley Railroad Co.,* 23 Cal. 268, 273; *England* v. *Lyon Fireproof Storage Co.,* 94 Cal.App. 562, 567 [271 P. 531] ; *Webber* v. *Bank of Tracy,* 66 Cal.App. 29, 34 [225 P. 41] ; *Atwood* v. *Southern California Ice Co.,* 63 Cal.App. 343, 346 [218 P. 283] ; Burden of proof on defendant: *Wilson* v. *Crown Transfer etc. Co.,* 201 Cal. 701, 706 [258 P. 596] ; *Dieterle* v. *Bekin,* 143 Cal. 683, 688 [77 P. 664] ; *Wilson* v. *California C. R. R. Co.,* 94 Cal. 166, 172 [29 P. 861, 17 L.R.A. 685] ; *Dodwell & Co.* v. *Los Angeles W. Co.,* 119 Cal.App. 457, 460 [6 P.2d 990] ; *Ferguson* v. *Green,* 99 Cal.App. 641, 643 [278 P. 1058] ; *Garrette* v. *Granger Business Assn.,* 58 Cal.App. 396, 398 [208 P. 1010].) In *Wilson* v. *Crown Transfer etc. Co.,* 201 Cal. 701 [258 P. 596], however, the court expressly considered the effect of section 8 and held that this section places the burden of proving due care on the defendant when goods are lost by fire. The court pointed out that *Wilson* v. *Southern Pacific R. R. Co.,* 62 Cal. 164, had been distinguished in *Wilson* v. *California C. R. R. Co.,* 94 Cal. 166 [29 P. 861, 17 L.R.A. 685] ; and *Dieterle* v. *Bekin,* 143 Cal. 583 [77 P. 664], on the ground that in the earlier case plaintiff had assumed the burden of proving negligence by pleading it in his complaint, whereas in the later cases plaintiff had framed his complaint on a breach of contract or conversion theory and so did not have to plead negligence. Defendant now contends that this distinction.is without merit, on the grounds that the burden of proof should not depend merely on the form of the pleadings and that regardless of the theory of the complaint the burden of proof on the issue of negligence should be upon plaintiff. It contends that when goods are destroyed by fire, the only breach of contract, if any, is the failure of defendant to exercise due care, and that under the system of code pleading it is immaterial whether plaintiff alleges such failure as a breach of contract or as negligence.

Although the court in the Crown Transfer case recognized that the cases decided before the adoption of the uniform act had been reconciled on the basis of the pleadings, it did not intend to make the burden of proof in cases involving storage contracts governed by the uniform act turn on whether plaintiff chose to allege only the contract and its breach instead of alleging that while stored under contract the goods were destroyed as a result of defendant's negligent custody. Thus

the court disapproved dicta in *Runkle* v. *Southern Pacific Milling Co.*, 184 Cal. 714 [195 P. 398, 16 A.L.R. 275], and *Atwood* v. *Southern California Ice Co.*, 63 Cal.App. 343 [218 P. 283], that the burden of proof on the issue of negligence was on plaintiff, although in the Runkle case plaintiff had adopted a negligence theory in his complaint, and in the Atwood case he had sued on the theory of conversion. It is clear, therefore, that in cases governed by the provisions of the uniform act, the burden of proving that the goods were not lost because of negligence is on the defendant, whether plaintiff frames his complaint on a negligence or a breach of contract theory. ■ Since it cannot be said as a matter of law that defendant has sustained this burden, the findings that defendant breached its contract and was negligent in the care of plaintiffs' goods cannot be disturbed for insufficiency of the evidence.

■ Defendant next contends that the trial court committed prejudicial error by admitting into evidence the opinions of plaintiffs' experts that the fire was caused by careless smoking. Defendant relies on *Feeney* v. *Standard Oil Co.*, 58 Cal.App. 587 [209 P. 85], and *Yore* v. *Pacific Gas & Electric Co.*, 99 Cal.App. 81 [277 P. 878], for the proposition that smoking by an employee is an act done not in the course of employment but for the enjoyment of the employee. Defendant contends that it would be liable for careless smoking only if it permitted smoking in places where it would create a hazard to the goods or retained in its employ known violators of its rule against smoking.

Various rules have been developed by courts that have considered the liability of an employer for damages caused by the smoking of employees. The Restatement of Agency in comment d of section 235 apparently follows the rule of the English courts that the act of smoking in itself is not in the course of the employment, but that if smoking on the job makes negligent the manner of performing an act in the course of employment, the employer will be liable for damages caused by smoking. (*Williams* v. *Jones,* 159 Eng. Reprints 528, affirmed, 159 Eng. Reprints 668; *Jefferson* v. *Derbyshire Farmers, Ltd.*, [1921] 2 K.B. 281; *Adams* v. *Southern Bell Telephone & Telegraph Co.*, 295 F. 586, 589; *Tomlinson* v. *Sharpe*, 226 N.C. 177, 183 [37 S.E.2d 498]; *Herr* v. *Simplex Paper Box Corp.*, 330 Pa. 129, 131 [198 A. 309]; *Kelley* v. *Louisiana Oil Refining Co.*, 167 Tenn. 101, 104 [66 P.2d 997]; *Shuck* v. *Carney*, 22 Tenn.App. 125, 130 [118 S.W.2d 896].)

Thus smoking in a woodshop has been held not to result in a negligent job of carpentry and the employer is not liable, but smoking while delivering gasoline results in a negligent job of delivery and the employer is liable.

Other courts, instead of attempting to determine whether smoking directly affects the job being done for the employer, determine whether smoking on the particular job creates an unreasonable risk to the property of third persons. If it does, these courts hold the employer liable despite the care he has taken to prevent smoking or the fact that smoking does not result in negligent performance of an act done in the course of the employment. (*Maloney Tank Mfg. Co.* v. *Mid-Continent Petroleum Corp.*, 49 F.2d 146, 150; *McKinney* v. *Bland*, 188 Okla. 661, 662 [112 P.2d 798] ; see, also, *Vincennes Steel Corp.* v. *Gibson*, 194 Ark. 58 [106 S.W.2d 173, 175].)

In *Feeney* v. *Standard Oil Co.*, 58 Cal.App. 587 [209 P. 85], the court stated by way of dictum that defendant would not be liable for careless smoking on the part of its gasoline delivery man, but held defendant liable for the failure of its employee to clean up spilled gasoline before he carelessly tossed a match into it. In *Yore* v. *Pacific Gas & Electric Co.*, 99 Cal.App. 81 [277 P. 878], the court, relying principally on the dictum in the Feeney case, held that smoking on the part of defendant's linemen was outside the scope of their employment and that defendant was not liable for damages caused by a grass fire resulting from careless smoking of the linemen. The Feeney case is opposed to the limited rule of liability of the Restatement, and the Yore case is opposed to those authorities that measure liability by the risk involved in smoking. It is clear, however, at least in bailments, that an employer is liable for negligent use of fire by his employees while on the premises whether or not the particular act is strictly directed toward the advancement of the employer's interest. ■ A bailee's employees while on the job are acting as custodians of the bailments, and any conduct on their part that creates an unreasonable risk of damage to the bailments renders them negligent as custodians. As custodians they are within the course of their employment, and their negligence in smoking may be imputed to their employer. (*Wilson* v. *Southern Pacific R. R. Co.*, 62 Cal. 164, 174; *Runkle* v. *Southern Pacific Milling Co.*, 184 Cal. 714, 719 [195 P. 398, 16 A.L.R. 275] ; see Rest., Agency, § 235, com. d.)

■ Moreover, in *Carr* v. *Wm. C. Crowell Co.*, 28 Cal.2d 652 [171 P.2d 5], this court in holding the employer liable for

an assault committed by his employee in a dispute arising out of the employment, said, ''The employer's responsibility for the tortious conduct of his employee 'extends far beyond his actual or possible control over the conduct of the servant. It rests on the broader ground that every man who prefers to manage his affairs through others, remains bound to so manage them that third persons are not injured by any breach of legal duty on the part of such others' while acting in the scope of their employment. (*Chase* v. *New Haven Waste Material Corp.*, 111 Conn. 377, 379-380 [150 A. 107, 68 A.L.R. 1497] . . .) Such injuries are one of the risks of the enterprise. [Citations.] In the present case, defendant's enterprise required an association of employees with third parties, attended by the risk that someone might be injured. 'The risk of such associations and conditions were risks of the employment.' (Cardozo, J., in *Leonbruno* v. *Champlain Silk Mills*, 229 N.Y. 470, 472 [128 N.E. 711, 13 A.L.R. 522].) Such associations 'include the faults and derelictions of human beings as well as their virtues and obediences. . . . They involve risks of injury and these risks are inherent in the working environment.' (*Hartford Acc. & Ind. Co.* v. *Cardillo*, 112 F.2d 11, 14; . . .)'' (28 Cal.2d at 655-656; see, also, *Fields* v. *Sanders*, 29 Cal.2d 834, 841 [180 P.2d 684, 172 A.L.R. 525].) In the present case, defendant's enterprise required the presence of employees in the warehouse and was attended by the risk that smoking on the part of an employee would set fire to the bailments. This risk is one arising out of the employment. Evidence that the fire was caused by careless smoking would not, therefore, absolve defendant of liability.

▮▮▮ The question remains whether the opinion evidence was admissible on the question of the cause of the fire. In *St. Paul F. etc. Co.* v. *Southern Pac. Co.*, 30 Cal.App. 140 [157 P. 247], it was held that the cause of fire is not ordinarily a question for expert opinion, ''but is a deduction which the court or the jury is equally competent to draw from the visible facts presented in evidence.'' (30 Cal.App. at p. 143.) In *Gallichotte* v. *California etc. Assn.*, 23 Cal.App.2d 570 [74 P.2d 73, 535], the court limited the rule of inadmissibility of the St. Paul case to situations where the expert had not been personally present at the fire. In *Manney* v. *Housing Authority*, 79 Cal.App.2d 453 [180 P.2d 69], however, the court pointed out that the admissibility of expert testimony does not depend on whether the expert has made a personal examination but on whether the fire is of a type whose cause the court

or jury could not readily infer unaided by expert testimony. (See *Vallejo etc. R. R. Co.* v. *Reed Orchard Co.*, 169 Cal. 545, 571 [147 P. 238]; Code Civ. Proc., § 1870(9); 7 Wigmore on Evidence [3d ed.] §§ 1918, 1923.) The possible causes of warehouse fires are sufficiently beyond the common experience of the ordinary judge or juror to justify the admission of expert opinion testimony on that issue.

Defendant contends, however, that the experts were allowed to give opinions based largely on hearsay statements made to them, and that it was denied the opportunity to examine the experts on *voir dire*. Both experts were present at the fire and made personal investigations, including interviews with defendant's employees, which served as the basis of their opinions. Ordinarily an expert must base his opinion either on facts personally observed or on hypotheses that find support in the evidence. (*Commercial U. A. Co.* v. *Pacific G. & E. Co.*, 220 Cal. 515, 524 [31 P.2d 793]; *Manney* v. *Housing Authority*, 79 Cal.App.2d 453, 461 [180 P.2d 69]; *Maggart* v. *Bell*, 116 Cal.App. 306, 311 [2 P.2d 516]; *Nelson* v. *Painless Parker*, 104 Cal.App. 770, 778 [286 P. 1078]; see 2 Wigmore on Evidence [3d ed.] §§ 674-682.) In this case the experts set forth in detail the facts and reasons on which they based their opinions. Their conclusion that the fire was caused by careless smoking was reached by a process of elimination of other possible causes. Although they testified early in the trial, the record shows that direct evidence was later introduced in support of most of the facts not personally observed by them. They excluded arson as a cause because unauthorized persons were not allowed on the second floor, a fact of which there was independent evidence, and because defendant's employees all denied having any grudge against the defendant. It is doubtful whether the trial court, in evaluating the experts' opinions in connection with the reasons on which they were based, gave any weight to the self-serving statements made to the experts by defendant's employees.

Furthermore, there is nothing to indicate that defendant was prejudiced because of the denial of *voir dire* examinations of the experts. Defendant fully cross-examined them, and there is no question raised as to their qualifications. Since it is improbable that different findings would have been made had the expert testimony been limited to opinions based on facts personally observed or been adduced by the use of hypothetical questions derived from facts supported by evidence in

the record, the error in the presentation of the experts' opinions was not prejudicial.

On the question of damages, defendant contends that any recovery for the destruction of plaintiffs' goods must be limited to the declared value of the goods stated in the warehouse receipt. In October, 1943, plaintiff wife wired defendant from Oregon, "Wire immediately if you will store my five rooms of valuable furniture." She received an affirmative reply. The goods were shipped to Los Angeles by the Navy and received by defendant on or about January 22, 1944. On February 24, 1944, a nonnegotiable warehouse receipt was mailed to plaintiffs together with an "identification card." This card was signed by both plaintiffs and returned to defendant. The warehouse receipt was labelled "NON-NEGOTIABLE WAREHOUSE RECEIPT AND CONTRACT" and contained on its face the following single paragraph: "Received for the account of Lt. Raymond George (hereinafter called the Depositor) whose latest known addess is . . . by Bekins Van & Storage Company (hereinafter called the Company) the goods described in the schedule below (contents and condition of contents unknown) to be handled on monthly storage in warehouse situated at 3625 S. Grand Avenue, Los Angeles, Calif., subject to the provisions, limitations, terms and conditions herein printed on the face and the reverse side hereof, all of which are agreed and assented to by the Depositor for himself and his heirs; and to be delivered to said Depositor upon payment of all charges. The Company's rates and its responsibility under this contract are based on the Depositor's declared value of $10.00 per 100 lbs. per article. See Provisions, Limitations, Terms and Conditions on the Reverse Side." The words "Depositor's declared value" were printed in bold-face type somewhat larger than the rest of the printing. The reference to the provisions on the reverse side was also in bold-face type. On the back of the receipt were printed 12 paragraphs. Paragraph 2 provided: "2. STORAGE RATES It is agreed that the storage rate charged is based upon the space occupied by the goods and upon the declared valuation herein stated, and for the purpose of fixing such charges, the Depositor declares that the value of any article, box, package, bundle or receptacle including the contents thereof . . . shall not exceed ten dollars per 100 pounds per article, unless the Depositor fixes a greater value in writing at the time of the delivery thereof to this Company and the same is receipted hereon, in which event the Depositor agrees to pay an addi-

tional charge therefor." Paragraph 6 provided: "6. LIABIL-
ITY OF COMPANY . . . (c) The company shall only be liable
for failure to use ordinary care and then only on the basis
of the Depositor's declared valuation of said goods." The
identification card signed by plaintiffs provided: "I hereby
acknowledge receiving your warehouse receipt and contract
number J-9806-22, accepting its terms and conditions and affix
hereto my official signature for your files." The reasonable
value of plaintiffs' goods was $3,126.15, and the value based
on weight at $10 per 100 pounds was $501.40. The trial court
found that plaintiffs never agreed to the declared value, that
defendant knew that the actual value exceeded the declared
value, and gave judgment for the full value of the goods de-
stroyed.

Defendant contends that its declared valuation clause is
a valid term in a warehouse receipt under section 3 of the
uniform act and that plaintiffs agreed to the declared value
of the property by retaining the warehouse receipt and for-
warding their acceptance to defendant. We agree with this
contention.

Section 3 of the Uniform Warehouse Receipts Act pro-
vides: "A warehouseman may insert in a receipt, issued
by him, any other terms and conditions, provided that such
terms and conditions shall not—(a) Be contrary to the pro-
visions of this act. (b) In anywise impair his obligation to
exercise that degree of care in the safekeeping of the goods
entrusted to him which a reasonably careful man would exer-
cise in regard to similar goods of his own." (3 Deering's
Gen. Laws, Act 9059, § 3.) Although there is a conflict among
the jurisdictions whether this section prohibits declared value
clauses (see 4 Williston on Contracts [rev. ed.] § 1046, p. 2927;
anno., 142 A.L.R. 776), it is settled in California that such
clauses are permissible under the uniform act. (*Page* v. *Ace
Van & Storage Co.*, 87 Cal.App.2d 294, 298 [196 P.2d 816];
*Rosenberg* v. *San Francisco Storage Co.*, 81 Cal.App. 715, 717
[254 P. 909]; *McMullin* v. *Lyon Fireproof Storage Co.*, 74
Cal.App. 87, 100 [239 P. 422]; see *Wilson* v. *Crown Transfer
etc. Co.*, 201 Cal. 701, 714 [258 P. 596].) These cases are
governed by analogy to those decided under section 2175 of
the Civil Code with respect to carriers. Section 2175 provides:
"A common carrier cannot be exonerated, by any agreement
made in anticipation thereof, from liability for the gross neg-
ligence, fraud, or willful wrong of himself or his servants."
In interpreting this section this court said: "At common law

a common carrier might make any other contract relative to the carriage of property intrusted to it, save one exempting it from liability for any kind of negligence. . . . The prohibition of the common law against a carrier limiting his liability for any kind of negligence is declared in this state by section 2175 only to apply to the limitation for gross negligence. But, in so declaring, our statute has added nothing to the restrictive force of the common-law rule. . . . In fact, section 2175, as it is but a declaration of that rule as far as it applies to contracts limiting liability for gross negligence, should not be interpreted as restricting the right of contract as to an agreed valuation of property for the purpose of fixing responsibility any further than it was restricted under the common-law rule. At common law such agreed valuation was not considered a limitation of liability for either ordinary or gross negligence. In jurisdictions in this country where the common-law rule obtains, it is the prevailing doctrine that there is a wide distinction between a contract by a carrier providing for exemption from liability for its negligence and a contract fairly entered into whereby, in consideration of a reduced rate of compensation for the transportation, the shipper and carrier agree upon a fixed valuation therefor under which the responsibility of the carrier in case of loss shall be measured.'' (*Donlon Bros.* v. *Southern Pacific Co.,* 151 Cal. 763, 770 [91 P. 603, 12 Ann.Cas. 1118, 11 L.R.A.N.S. 811] ; see, also, *Franklin* v. *Southern Pac. Co.,* 203 Cal. 680, 687 [265 P. 936, 59 A.L.R. 118] ; *Mering* v. *Southern Pacific Co.,* 161 Cal. 297, 300-301 [119 P. 80] ; *Pierce* v. *Southern Pacific Co.,* 120 Cal. 156, 166-167 [47 P. 874, 52 P. 302, 40 L.R.A. 350] ; Robinson on Admiralty, § 76, p. 538.) The validity of such valuation clauses does not depend on the relationship between the actual value and the stipulated value, or on whether the carrier or bailee has knowledge that the actual value is greater than the stipulated value. (*Reid* v. *Fargo,* 241 U.S. 544, 551 [36 S.Ct. 712, 60 L.Ed. 1156] ; *Pierce Co.* v. *Wells, Fargo & Co.,* 236 U.S. 278, 284 [35 S.Ct. 351, 59 L.Ed. 576] ; *Hart* v. *Pennsylvania Railroad Co.,* 112 U.S. 331, 337 [5 S.Ct. 151, 28 L.Ed. 717] ; *Mering* v. *Southern Pacific Co.,* 161 Cal. 297, 299-301 [119 P. 80] ; *Donlon Bros.* v. *Southern Pacific Co.,* 151 Cal. 763, 776 [91 P. 603, 12 Ann. Cas. 1118, 11 L.R.A.N.S. 811] ; *Page* v. *Ace Van & Storage Co.,* 87 Cal.App.2d 294, 298-299 [196 P.2d 819] ; see *Wilson* v. *Crown Transfer etc. Co.,* 201 Cal. 701, 712-714 [258 P. 596] ; 4 Williston on Contracts [rev. ed.] § 1110, p. 3154.)

*England* v. *Lyon Fireproof Storage Co.*, 94 Cal.App. 562 [271 P. 532], which held that a declared value clause was invalid when the bailee knew the actual value of the goods, erroneously construed the clause there involved as one exempting the bailee from liability for his own negligence, and is not in accord with the cases cited above and is disapproved.

The question remains whether plaintiffs agreed to the stipulated value of their goods in this case. When goods are delivered to a warehouseman for storage and no warehouse receipt is issued at the time of delivery, an implied contract of storage arises containing those terms required by law.

If this contract is to be superseded by the contract contained in the subsequently issued warehouse receipt, it is necessary that the bailor agree to the written contract as proposed by the bailee. Ordinarily such assent may be found in the acceptance and retention of the warehouse receipt by the bailor. (*Taussig* v. *Bode & Haslett,* 134 Cal. 260, 266 [66 P. 259, 86 Am.St.Rep. 250, 54 L.R.A. 774] ; see *Wilson* v. *Crown Transfer etc. Co.,* 201 Cal. 701, 712-713 [258 P. 596] ; 1 Williston on Contracts [rev. ed.] § 90B, p. 266.) It is not necessary, however, to decide in this case whether the mere retention of the warehouse receipt would bind plaintiffs to the terms therein. Plaintiffs signed and returned to defendant a written acceptance of the warehouse receipt and contract. By so doing they accepted defendant's offer to store the goods at a rate based on the value clearly stated on the face of the receipt. The identification card was not designed to conceal the fact that it was to be used as a form for acceptance of the contract. It contained only two sentences, the first of which recited acceptance of the terms of the warehouse receipt and contract. Furthermore the warehouse receipt itself was not designed in any way to conceal its nature. It was clearly labelled ''Warehouse Receipt and Contract.'' The reference to declared value was in bold-face type on its face followed immediately by reference in bold-face type to the terms on the reverse side. The paragraphs on the reverse side were short and headed by large upper-case bold-face titles indicating their content. If plaintiffs had read the receipt and been dissatisfied with its terms, they could have rejected it, thus leaving the implied contract in force unmodified until they could agree on new terms with defendant or arrange other storage. Instead they sent their acceptance to defendant, and it is immaterial on the facts in this case that neither read the contract they accepted. (*Constantian* v. *Mercedes-Benz Co.,* 5

Cal.2d 631, 634 [55 P.2d 841] ; *Gridley* v. *Tilson,* 202 Cal.
748, 752 [262 P. 322] ; *Taussig* v. *Bode & Haslett,* 134 Cal.
260, 266 [66 P. 259, 86 Am.St.Rep. 250, 54 L.R.A. 774] ;
*Nichols* v. *Hitchcock Motor Co.,* 22 Cal.App.2d 151, 155 [70
P.2d 654] ; *Greve* v. *Taft Realty Co.,* 101 Cal.App. 343, 352
[281 P. 641] ; *Cunningham* v. *International Com. Y.M.C.A.,*
51 Cal.App. 487, 490 [197 P. 140] ; *U Drive, etc. Ltd.* v.
*System A. Parks,* 28 Cal.App.2d Supp. 782, 787 [71 P.2d
354] ; see, Rest., Contracts, § 70 ; 1 Williston on Contracts
[rev. ed.] § 90A, p. 257.)

▇▇▇ By issuing its warehouse receipt defendant proposed
the terms to plaintiffs on which it would continue to store the
goods. Plaintiffs accepted this offer, and defendant's con-
tinued performance of the contract as bailee was adequate con-
sideration to support the limitation clause.

Even assuming that continuing to act as bailee was
not sufficient consideration, the reduced rate at which the
goods were stored was adequate consideration to support the
limitation of liability. Regardless of what defendant charged
plaintiffs for the first month's storage, they were entitled to
propose to plaintiffs rates for the future based on the valua-
tion of the goods. Plaintiffs cannot complain if defendant
chose to charge them less for the first month than they would
have charged had they been informed of the exact value plain-
tiffs placed on the goods. It is immaterial what rate defendant
adopted for storage between the time it received the goods and
was able to conclude a contract with the bailor in which the
rates for the future were fixed with reference to the stipulated
value. The fact is that if plaintiffs had not agreed to the
stipulated value and had specified a higher value, they would
from that time forward at least have been charged a higher
rate. The advantage to plaintiffs of the lower rate for the
future was adequate consideration for the limitation of lia-
bility.

There is no indication that had plaintiffs on receipt of the
warehouse receipt specified a higher value for their goods,
defendant would not have charged them the higher rate for
the first month. Defendant billed plaintiffs on the assump-
tion that the stipulated value was 10 cents per pound. The
amount billed was qualified by that valuation and had plain-
tiffs not agreed that the stipulated value was correct, defend-
ant would have been at liberty to revise its charges for the
first month. There was an express finding of the trial court,

supported by evidence, that "the storage charges paid by plaintiffs and accepted by Bekins Van and Storage Company, a corporation, were based upon valuation as declared" in the warehouse receipt. From this finding it is clear that had plaintiffs stipulated a higher value for their goods defendant would have charged them a higher rate from the outset of the bailment. Although it is true that had the goods been destroyed before the warehouse receipt was issued, defendant would have been liable for an amount not in excess of what it was informed by the depositor or had reason to suppose the goods were worth (Civ. Code, § 1840), its rates in that case would have reflected the higher value. Defendant was not maintaining the same rate while at the same time seeking to reduce its liability to plaintiffs. Defendant was maintaining the same rate because plaintiffs agreed that defendant's liability based on the value of the goods proposed by defendant was correct.

*Maryland Casualty Co.* v. *First Nat. Bank,* 82 F.2d 466, does not support a contrary position. In that case defendant issued its one year policy of robbery insurance to plaintiff for an agreed premium. Thereafter defendant sought to attach a rider to the policy reducing the coverage provided for in the previously accepted policy. Plaintiff accepted the rider because of innocent misrepresentations of defendant's agent in reference to its effect. Defendant did not offer to reduce the premium in consideration for the reduced coverage nor did it inform plaintiff that it would exercise its right to cancel the insurance if the rider were not accepted or a higher premium paid. The court held that the attempted modification was invalid because of mutual mistake and because defendant did not give up its cancellation rights in consideration of the reduced coverage. In the present case, however, the rates were in fact determined by the declared value and had the declared value not been agreed to by plaintiffs the rates would have been increased in accord with the statement to that effect in the warehouse receipt. (See *Bassi* v. *Springfield Fire. etc. Ins. Co.,* 57 Cal.App. 707, 712 [208 P. 154].)

Plaintiffs' motion to dismiss the appeal on the ground that it was not taken from the final judgment in the action was denied by the District Court of Appeal (*George* v. *Bekins Van & Storage Co.,* 83 Cal.App.2d 478 [189 P.2d 301]), and hearing was denied in this court. That ruling must be deemed final. (*Easton* v. *Ash,* 18 Cal.2d 530, 539 [116 P.2d 433]; *Hartfield* v. *Alderete,* 26 Cal.App. 604, 605 [147 P. 991];

*Edwards* v. *Brockway,* 16 Cal.App. 626, 631 [117 P. 787]; see *White* v. *Fresno Nat. B'k.,* 98 Cal. 166, 167 [32 P. 979].) In *Estate of Stierlen,* 199 Cal. 140 [248 P. 509], relied on by plaintiffs for the rule that the granting of hearing by this court on the merits reopens an earlier decision denying a motion to dismiss made on the same grounds, the order denying the motion to dismiss the appeal was entered simultaneously with the decision on the merits. (See *Estate of Stierlen,* 49 Cal.App.Dec. 62.) In this case the order denying the motion to dismiss became final before the decision on the merits by the District Court of Appeal.

The motion to dismiss the appeal is denied. The judgment is modified by striking therefrom the figures $3,126.15 and inserting therein in lieu thereof the figures $501.40. As so modified the judgment is affirmed.

Gibson, C. J., Edmonds, J., and Spence, J., concurred.

CARTER, J.—I dissent.

I agree with that part of the majority opinion dealing with negligence and burden of proof, but I am unable to agree with the conclusion reached with respect to the damages to be recovered by plaintiffs or the reasons assigned therefor. I am in accord with a statement made in 37 Columbia Law Review 248, 262, to the effect that the provision of the Uniform Warehouse Receipts Act against exculpation of the warehouseman has been judicially emasculated by way of the valuation device. The conclusion reached in this case is an excellent illustration of that statement, and is, moreover, without foundation in contract law.

In October, 1943, plaintiff wife wired defendant from Oregon as follows: "Wire immediately if you will store my five rooms of valuable furniture." She received an affirmative reply. The goods were shipped to Los Angeles by the Navy and received by defendant on or about January 22, 1944. On February 24, 1944 (over a month later), a nonnegotiable warehouse receipt was mailed to plaintiffs, together with an "identification card." The effect of the wire, the acceptance, the delivery of the goods and the acceptance of them by defendant, and the fact that the goods remained in storage for over a month before the receipt was sent to plaintiffs, appears to have been overlooked by the majority. It was the instrument labeled "Non-negotiable Warehouse Receipt and Contract" which contained the clause purporting to limit the defendant's

liability. The question first to be decided is at what time did the contract of bailment become effective?

Section 1814 of the Civil Code provides that: "A voluntary deposit is made by one giving to another, with his consent, the possession of personal property to keep for the benefit of the former, or of a third party. The person giving is called the depositor, and the person receiving the depositary." It would appear that the bailment became effective upon delivery of the furniture to the defendant and acceptance by it.

Upon delivery of the goods to the defendant, the mandatory provisions of the warehouse receipt statute then in effect became part of the implied contract for storage between the parties. (*Voyt* v. *Bekins Moving & Storage Co.,* 169 Ore. 30 [119 P.2d 586, 127 P.2d 360]; *French* v. *Bekins Moving & Storage Co.,* 118 Colo. 424 [195 P.2d 968].) No other limitations on the common-law liability of the warehouseman can avail him unless they were brought to the attention of the bailor and assented to *at the time of the bailment, or thereafter agreed to for a valuable consideration.* (*French* v. *Bekins Moving & S. Co., supra*; *Brasch* v. *Sloan's Moving & Storage Co.,* 237 Mo.App. 597 [176 S.W.2d 58]; *Colgin* v. *Security Storage & Van Co.,* 208 La. 173 [23 So.2d 36, 160 A.L.R. 1107]; *Healy* v. *New York Central etc. Co.,* 153 App. Div. 516 [138 N.Y.S. 287].) It is the section dealing with permissive conditions which a warehouseman may insert in a receipt, issued by him, with which we are here concerned. (Uniform Warehouse Receipts Act, § 3.)

In the present case, the warehouse receipt contained this provision: "It is agreed that the storage rate charged is based upon the space occupied by the goods and upon the declared valuation herein stated, and for the purpose of fixing such charges, the Depositor declares that the value of any article, box, package, bundle or receptacle including the contents thereof, packed, transported, received, handled or stored hereunder or later received for the account of said Depositor shall not exceed ten dollars per 100 pounds per article, unless the Depositor fixes a greater value in writing at the time of the delivery thereof to this Company and the same is receipted hereon, in which event the Depositor agrees to pay an additional charge therefor."

The depositor here declared the goods to be valuable, and a month thereafter, after the contract of bailment arose and had been partially executed, the defendant sought to modify the contract by limiting its liability to 10 cents per pound.

Where is the consideration for this contract as modified? There is nothing in the record to show that defendant brought to the attention of plaintiffs at the *time of the bailment* the fact that if they wished to store their goods and impose liability on the bailee (in the event of loss) for the full reasonable value of the goods they must pay a higher rate.

"It frequently happens that a warehouse receipt containing a clause limiting the warehouseman's liability is not given to the bailor simultaneously with the acceptance of the goods by the warehouseman but is sent to him at a later time, and the question then arises whether the bailor is bound by this clause regardless of the fact that he has no actual knowledge thereof. . . . The general rule seems to be that where at the commencement of the bailment no mention of the stipulation limiting the liability of the warehouseman is made, the contract cannot subsequently be changed by provisions in the warehouse receipt without the consent of the bailor." (160 A.L.R. 1112, 1117.)

Plaintiff wife, by wire, informed defendant that she considered the goods valuable. The reasonable value of the furniture was found to be $3,126.15; the liability of defendant, under the limitation clause in the warehouse receipt, was $501.40. Thus, defendant, by the limitation clause in the warehouse receipt, is modifying the original contract by providing that plaintiffs shall consider their furniture worth one-sixth of its reasonable value.

There are numerous cases from other jurisdictions, decided under the Uniform Warehouse Receipts Act, in which the courts have refused to enforce such a contract. Section 57 of the act provides that "This act shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it." The act is in effect in all of the 48 states. In *Cothren* v. *Kansas City Laundry Service Co.*, (Mo.App.) 242 S.W. 167, at 168, the court said: "Limitations of liability, even those permissible under the law, 'must be contained in or made part of the original contract of bailment,' for that arises upon delivery of the goods to the bailee, and the latter cannot afterward impose conditions nor limit his liability resulting from such bailment." In *Brasch* v. *Sloan's Moving & Storage Co., supra,* at page 60 [176 S.W.2d], the court said: "When it is said that the act becomes a part of the contract between the owner and the warehouseman, what is meant is that the agreement

between them must be deemed to have embodied all the various terms required by the act, as to which the parties are necessarily charged with knowledge. In other words, when the receipt is accepted, the parties are to be regarded as having mutually agreed to all the terms and conditions made mandatory by the act; but as to terms and conditions not made mandatory by the act and not inconsistent with its provisions, the parties are left free to contract as they wish, and an express meeting of the minds as to all such terms and conditions is no less essential than in any other character of contract. It follows, therefore, that as to the terms and conditions made mandatory by section 15,501 (section 2, Uniform Act), the owner, when he accepts his receipt, is constructively charged with knowledge of them since they are not alone for the advantage of the warehouseman, but inure to his own benefit as well; but as to terms and conditions not made mandatory by section 15,501, but which are merely permissive under section 15,502 (section 3), which redounds primarily to the benefit of the warehouseman, the owner is not charged with notice unless such terms and conditions are brought to his attention and he thereupon assents to them so as to make them a part of the contract between himself and the warehouseman.'' (*Colgin* v. *Security Storage & Van Co., supra; Voyt* v. *Bekins Moving & S. Co., supra.*)

The majority opinion concedes that at the time the bailment took place, plaintiff's goods were stored under an implied contract by which defendant would have been liable for their reasonable value. The goods were in storage for over one month before the receipt was issued. Plaintiffs paid, as the storage rate for that month, the sum of $7.60. This is the *same rate* that was paid thereafter for the valuation of $501.40 which was placed on the goods in the receipt issued by the *bailee*. This brings to light the fact that a bailor may, in consideration of reduced liability on the part of the bailee, pay a reduced rate. The effect of the holding in the majority opinion is to say that a partially executed contract may be modified by one of the parties without a new consideration. This is not the law, either in cases involving warehouse receipts, or other types of contracts.

''There can be no doubt of the principle contended for by the appellant that an agreement adding to the terms of an existing agreement between the same parties, and by which new and onerous terms are imposed upon one of the parties without any compensating advantage, requires a consideration

to support it; though this, of course, may consist either in a new consideration or in some favorable modification of the original contract. . . . 'But . . . the variation of a contract is as much a matter of contract as the original agreement' (*Feterman* v. *Parker*, 10 Ired. 474); and a contract for such variation, equally with other contracts, requires a consideration.'' (*Main St. etc. Co.*, v. *Los Angeles Trac. Co.*, 129 Cal. 301, 305 [61 P. 937]; *Peachy* v. *Witter*, 131 Cal. 316 [63 P. 468]; 6 Cal.Jur. 185; *Anderson* v. *Adler*, 42 Cal.App. 776 [184 P. 42]; *Bonifacio* v. *Stuart*, 52 Cal.App. 487 [199 P. 69]; *Bassi* v. *Springfield Fire etc. Ins. Co.*, 57 Cal.App. 707 [208 P. 154]; *Krobitzsch* v. *Middleton*, 72 Cal.App.2d 804 [165 P.2d 729]; *Berkowitz* v. *Tyderko, Ltd.*, 13 Cal.App.2d 561 [57 P.2d 173]; *Voyt* v. *Bekins etc., Co., supra*; *State ex rel. Terry* v. *Ace Storage & Moving Co.*, (Mo.App.) 135 S.W.2d 363; 42 A.L.R. 987, 996, 1101; 43 A.L.R. 1451, 1454.) In the latter note is found the following statement: ''And a new agreement supplementing or modifying an existing contract is in legal contemplation an independent contract, requiring for its validity all the elements of a contract.'' In *Maryland Casualty Co.* v. *First Nat. Bank*, 82 F.2d 465, after issuance and delivery of a bank robbery policy, a rider was attached thereto restricting coverage on money not under time-lock protection to 15 per cent of the total robbery insurance without reduction or concession in cost, and the rider was held unenforceable for lack of consideration.

The rule stated in *Wilson* v. *Crown Transfer etc. Co.*, 201 Cal. 701, at 714 [258 P. 596], that ''The right of warehouse owners to limit their liability by such a notice is given in order that they may protect themselves from unreasonable and excessive demands for loss of goods without any previous knowledge of their real value. No such reason for applying this rule applies in the present action. The appellant was fully advised by respondents as to the true value of their goods. Appellant was, therefore, in a position to protect itself by giving the respondents' property the care and supervision its rather large value required, and to *make a charge therefor based upon such valuation*,'' is applicable here. [Emphasis added.] Defendants were advised and knew of the valuation placed by plaintiffs upon the goods. It was defendant's responsibility to make a charge for storage commensurate with that valuation if it wished to protect itself. But defendant chose to attempt to modify the contract by arbitrarily placing upon the goods a valuation of 10 cents per pound and making

a charge in accordance therewith. I submit that this attempted modification·of the contract which arose upon the receipt and acceptance of the goods by defendant and which was executed more than a month thereafter was void for want of consideration. A void contract gives rise to no rights or liabilities, and is unenforceable, and it would seem quite immaterial whether the plaintiffs accepted the warehouse receipt or not. A bare promise to accept less than that to which one is entitled under a contract is not binding. (*Hughes* v. *Davis,* 40 Cal. 117; *Pierson* v. *McCahill,* 21 Cal. 122; Restatement of the Law of Contracts, § 75.) ''[W]ant of consideration renders a contract unenforceable.'' (*Gregson Estate,* 96 Cal.App. 767 [274 P. 991]; 6 Cal.Jur. 186.) An agreement void for lack of consideration is, in effect, no agreement. (*Bliss* v. *Richardson,* 12 Cal.App.2d 380, at 385 [55 P.2d 591].)

As the annotation in 160 American Law Reports, page 1112, at 1117, points out, the decided cases draw a distinction between situations where the warehouse receipt and contract is given at the time of the receipt of the goods and those where the goods are accepted and subsequently the contract and receipt is made out. The cases cited in support of the following statement found in the majority opinion involve the situation where the receipt was given at the time of delivery of the goods: ''The validity of such valuation clauses does not depend on the relationship between the actual value and the stipulated value, or on whether the carrier or bailee has knowledge that the actual value is greater than the stipulated value.'' In *Mering* v. *Southern Pacific Co.,* 161 Cal. 297, at 300 [119 P. 80], plaintiff shipped a mare over defendant's railroad lines under a special contract, and ''As executed the contract was entirely acceptable to the plaintiff at the time. Its provisions were thoroughly discussed between plaintiff, who was a practicing attorney, and the agent of the defendant, before it was executed.'' *Donlon Bros.* v. *Southern Pacific Co.,* 151 Cal. 763, at 764 [91 P. 603, 12 Ann.Cas. 1118, 11 L.R.A.N.S. 811], involved the shipment of horses. It appears that plaintiff applied to defendant for the transportation of the animals. ''The result of the negotiations between them was that Delaney chartered for forty two dollars a whole car to transport the horses, and a certain document in relation thereto was executed by himself and the agent of the defendant.'' In *Page* v. *Ace Van & Storage Co.,* 87 Cal.App. 2d 294 [196 P.2d 819], plaintiff and the agent of defendant dealt on a face to face basis, and the ''work order'' and ''cer-

tificate" were signed by plaintiff *at the time of the delivery of the goods to the defendant's agent.* In *Wilson* v. *Crown, etc. Co.,* 201 Cal. 701 [258 P. 596] (a case which does not appear to be authority for the statement quoted), the receipt for the goods was delivered *after* they were deposited with defendant.

In the United States Supreme Court cases cited in the majority opinion as authority, the parties were in mutual agreement, and the receipt or bill of lading appears to have been delivered to the shipper at the time the goods were delivered. In *Reid* v. *Fargo,* 241 U.S. 544 [36 S.Ct. 712, 60 L.Ed. 1156], the situation was slightly different from that under consideration here. The shipper delivered a car to an express company, informing it that the car was worth $3,900; the express company delivered the car to a steamship company to be sent to New York, and accepted a bill of lading limiting the liability of the steamship company to $100. The express company was held liable for the loss of the car by the steamship company for any deficiency over and above the $100 limited liability imposed on the steamship company because the express company knew of the great value of the car. *Pierce Co.* v. *Wells Fargo & Co.,* 236 U.S. 278 [35 S.Ct. 351, 59 L.Ed. 576], involved parties who had had previous dealings. When the cars were delivered to the railroad, the agent of the automobile company accepted a bill of lading in which there was no declaration of value and which contained a limitation of liability on the part of the railroad to $50 per car. This omission (since the cars previously shipped had been valued at a high rate) was expressly called to the attention of the agent who replied that it was an intentional omission and the result of a new policy of his company. In *Hart* v. *Pennsylvania Railroad Co.,* 112 U.S. 331 [5 S.Ct. 151, 28 L.Ed. 717], horses were delivered to the carrier by the shipper and a bill of lading containing a limitation of liability was delivered to the shipper.

There is no doubt that, as stated by the majority, the *validity* of the valuation clauses does not depend on the relationship between the actual value and the stipulated value, or whether or not the bailee has knowledge of the actual value of the goods, but the statement must be qualified. The validity and enforceability of such limitation clauses depend upon the law of contracts which prescribes, among other things, that there must be mutual assent and consideration, and that

these are essential elements of a binding and enforceable contract.

For the reasons above stated, I would affirm the judgment as rendered. Each side is to bear its own costs on appeal.

Shenk, J., and Schauer, J., concurred.

The opinion and judgment were modified to read as above and respondents' petition for a rehearing was denied June 9, 1949. Shenk, J., Carter, J., and Schauer, J., voted for a rehearing.